

FILED    ENTERED
LODGED    RECEIVED

JAN 1 3 2005 **MR**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
SEATTLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel, PATRICIA WEST, MBA, RCS, RVS, AND DR. ALEXANDER D. SERRA, | NO. **CV05-0058** |
| Plaintiffs/Relators | **QUI TAM COMPLAINT** |
| v. | **JURY DEMAND** |
| CENTER FOR DIAGNOSTIC IMAGING, INC., MINNESOTA SCANNING CONSULTANTS PHYSICIAN ASSOCIATION, and CDI-SEATTLE, LLC, | **FILED UNDER SEAL** |
| Defendants | 05-CV-00058-CMP |

This is a civil qui tam action brought on behalf of the United States of America of America by Patricia West and Dr. Alexander Serra against Center for Diagnostic Imaging, Inc., Minnesota Scanning Consultants Physician Association and CDI and Seattle, LLC subject to the qui tam provisions of the Civil False Claims Act, pursuant to 31 USC §§ 3729-33.

Defendant, Center for Diagnostic Imaging, Inc. (hereinafter "CDI"), submits claims to federally-funded health insurance programs, as well as private insurers for millions of dollars

QUI TAM COMPLAINT - 1



GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

annually for radiological exams.  An alarmingly high percentage of the radiological exams performed by CDI at its imaging centers across the United States do not meet basic medical necessity standards, which is an absolute prerequisite for payment by federally-funded health insurance programs.  Relators come forward with direct proof of systemic medical necessity violations at multiple CDI facilities across the United States.

The radiological exams are reimbursed in whole or in part by federally-funded health insurance programs, such as Medicare, Medicaid, the Civilian Health and Medical Program of the Uniform Services ("CHAMPUS") and the Civilian Health and Medical Program of the Veterans Administration ("CHAMPVA") (hereinafter collectively referred to as "federal programs").  Had these federal programs known that CDI was performing tens of thousands of tests per year without the most basic component essential to medical necessity – a valid physician's order – no payment or reimbursement would have been made to CDI or to any of the defendants.  Payment would have similarly been denied if it had been known that defendants were providing free tests and/or discounted rates to illegally induce physicians to make patient referrals.  In the instances where discounted rates were provided by CDI to its lessees, the discount schemes discriminated against federal program payors.

In addition to the federal programs that were defrauded by the defendants as set forth herein, state Medicaid programs, as well as  state-funded programs in Minnesota, Kansas, Wisconsin, Florida, Illinois, Missouri, Indiana and Washington also suffered losses as a direct result of the fraudulent conduct of defendants as set forth hereafter.

QUI TAM COMPLAINT - 2

## THE PARTIES

1.     Patricia West, MBA, RCS, RVS (hereinafter "Relator West") resides in Kenmore, Washington.  She presently is employed by CDI as Vice-President of Operations and Business Development for the State of Washington.

2.     Relator West obtained a Bachelor of Science degree in Healthcare Management from Century University in Albuquerque, New Mexico in 1994.

3.     Relator went on to obtain  an MBA in Healthcare Management from Century University in 1998.

4.     Relator West is a registered cardiovascular technologist and a registered vascular specialist.

5.     Relator West is a "Certified Compliance Professional."  To the best of her knowledge and belief, she is the only Certified Compliance Professional employed by CDI. Even the CDI Director of Compliance does not hold this certification.

6.     Relator West is the Vice-President of Business Development and Operations for CDI in the State of Washington.  Her job responsibilities include the management of operations, marketing and business development for CDI's Washington diagnostic centers.

7.     Dr. Alexander D. Serra (hereinafter "Relator Serra") is a radiologist.  He resides in Federal Way, Washington.

8.     Relator Serra is the founding partner of Sound Medical Imaging.  Sound Medical Imaging currently services CDI out-patient imaging centers in the Pudget Sound region of Washington State.

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

9.      Relator Serra was a 1987 magna cum laude graduate of Dartmouth College. He completed his internship in Internal Medicine at Greenwich Hospital, a teaching affiliate of Yale/New Haven Medical Center in Greenwich, Connecticut from 1991-92.

10.     Relator Serra received his M.D. degree in 1991 from Cornell University Medical College in New York, New York. He is presently licensed to practice medicine in the states of Washington and Minnesota.

11.     From July 1992 to June 1996, Relator Serra completed his residency in Radiology at the University of Colorado Health Sciences Center in Denver, Colorado. Relator Serra received post-graduate training during his Fellowship in MRI/Body Imaging at the University of California, San Francisco, California. He was appointed to the position of Clinical Instructor from June 1996 through July 1997.

12.     Relator Serra is a Radiologist with expertise in MRI, body and musculoskeletal imaging and spine intervention.

13.     Relator Serra is Board certified in Diagnostic Radiology by the American Board of Radiologists. He is a member of Radiological Society of North America, American Roentgen Society, International Spine Injection Society, American College of Radiology, Washington State Radiological Society, Washington State Medical Society, and Pierce County Medical Society.

14.     Defendant CDI was founded in 1981 by a radiologist, Dr. Ken Heithoff. It is believed that Dr. Heithoff owned 60% of CDI up until the acquisition of CDI by Onex. His present ownership interest is not known.

15.     CDI is a national radiology and diagnostic imaging company headquartered in Minneapolis, Minnesota. CDI owns diagnostic centers in the states of Minnesota, Illinois,

QUI TAM COMPLAINT - 4

Kansas, Missouri, Indiana, Florida and Washington and, therefore, conducts business in each state.

16.     CDI is a leading national provider of diagnostic and therapeutic radiology services.  The company operates 32 diagnostic imaging centers in nine geographic markets across the United States.  CDI's imaging services included magnetic resonance imaging ("MRI"), computed tomography ("CT"), diagnostic and therapeutic injection procedures ("needles") and other procedures such as PET/CT, conventional x-ray,  mammography and myriad ultrasound procedures.  CDI's annual revenues exceed $125 million per year.

17.     On or about October 29, 2004, Onex Partners LP signed an agreement to acquire CDI in a transaction valued at approximately $225 million.

18.     Onex Partners LP is a $2.2 billion private equity fund established by Onex Corporation.  Onex Corporation has annual consolidated revenues of approxi-mately $16 billion dollars.  Onex Corporation's shares trade on the Toronto Stock Exchange under the stock symbol OCX.SV.

19.     The completion of the acquisition of CDI by Onex Partners LP is subject to customary terms and conditions, including the receipt of regulatory approvals.  The expected completion date of the acquisition was December 2004.  Relators have it, upon information and belief, that said transaction has recently been finalized.

20.     Minnesota Scanning Consultants Physician Association ("MSCPA") is an association of radiologists who perform professional services for CDI patients.  Dr. Heithoff formed MSCPA as well as CDI.  The primary purpose of MSCPA is to provide the professional component involved with the diagnostic tests and therapeutic procedures for the outpatient imaging services delivered to CDI patients and CDI markets across the United

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

States.   MSCPA routinely assigns to CDI the right to submit claims for payment for professional services rendered to federal and state program beneficiaries.

21.    In all of CDI's diagnostic centers, the reading radiologists belonged to MSCPA with the exception of the radiologists reading in the States of Washington, Wisconsin, and the CDI sites located in Duluth, Minnesota.   In those three geographic areas, the physicians created their own professional association independent of MSCPA.

22.    CDI - Seattle, LLC is a limited liability corporation that operates an out-patient imaging center in Seattle, Washington.   CDI – Seattle, LLC is owned by defendant CDI and three (3) individual radiologists.   The radiologists are Doctor(s) Scott McCorkell, Alan Schwartz, and Susan Bates.   Upon information and belief, CDI owns 51% and the three individual physicians own 49% of CDI – Seattle, LLC.

## JURISDICTION AND VENUE

23.    The Court has subject matter jurisdiction over this action pursuant to 28 USC §§ 1331 and 1345, which is a "law of the United States."

24.    This Court has personal jurisdiction over CDI, MSCPA and CDI – Seattle, LLC (hereinafter collectively referred to as "defendants") because they maintain offices and transact business in the Western District of Washington.

25.    This Court has personal jurisdiction over defendants because they conduct business in the Western District of Washington and perform services and submit claims for payment for the services rendered within this district.

26.    Venue is appropriate within the Western District of Washington pursuant to 28 USC § 1391(a)(1)(2) because defendants have offices within the Western District of

QUI TAM COMPLAINT - 6

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

Washington and has performed numerous acts proscribed by 31 USC § 3729, et seq., within the Western District of Washington.

## THE APPLICABLE LAW

### A. The Federal False Claims Act

27.    The False Claim Act ("FCA") provides, in pertinent part:

(a)    Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person . . . .

(b)    For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

### B. The Federal Anti-Kickback Act

28.    The Federal Anti-Kickback Act (AKA) makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person to (1) refer an individual to a person for the furnishing of any item or service covered under a federal healthcare program; or (2) purchase, lease, order, arrange for or recommend any good, facility,

QUI TAM COMPLAINT - 7

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

service, or item covered under a federal healthcare program.  42 U.S.C. § 1320a-7b(b)(1) and (2).

29.     The term **"any remuneration"** encompasses any kickback, bribe, or rebate, direct or indirect, overt or covert, cash or in kind.  42 U.S.C. § 1320a-7b(b)(1).  The term "any remuneration" also encompasses economic arrangements, such as discounts and free ancillary services.  The AKA has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.

30.     One type of CDI lease used across the country involves diagnostic services joint venture arrangements which violate the AKA.  OIG advisory opinions have been issued with regard to similar arrangements where it has been concluded that said arrangements would constitute grounds for the imposition of sanctions and penalties.

31.     Under the CDI leases, the joint venture arrangements generate prohibited remuneration under the AKA.

32.     The CDI leases are established to permit CDI and the lessees to do indirectly what they cannot do directly; that is, pay the lessee a share of the profits from the laboratory referrals made by the lessee to CDI.

33.     By agreeing to provide services that CDI could otherwise provide in its own right for less than the available reimbursement, CDI is providing a referral source – the lessee physician groups – with the opportunity to generate a fee and a profit.

34.     Because the intent of the joint venture arrangement is to give the lessee physician groups remuneration through the CDI labs in exchange for referrals to the CDI labs, the Anti-Kickback statute is violated.

QUI TAM COMPLAINT - 8

35.    These joint venture arrangements constitute improper contractual joint ventures that are used as vehicles to reward the lessee physician groups for their referrals.

36.    Knowing and willful conduct is a necessary element of this criminal offense. 42 U.S.C. § 1320a-7b(b)(1).  An act is willful if "the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law." *United States v. Starks*, 157 F.3d 833, 837-8 (11th Cir. 1998).  The statute has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989); *United v. Greber*, 760 F.2d 68 (3d Cir.), *cert. denied*, 474 U.S. 988 (1985).

37.    Violation of the statute constitutes a felony punishable by a maximum fine of $25,000, imprisonment up to five years, or both.  Any party convicted under the AKA must be excluded (i.e., not allowed to bill for any services rendered) from federal healthcare programs for a term of at least five years.  42 U.S.C. § 1320a-7b(a)(1).

38.    Although some forms of discounting in pricing are legal, it is not legal to offer services or product discounts to buyers and not offer the discounts to federal programs.  Price discrimination against federal programs constitutes a violation of the federal AKA as amended.

39.    Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the AKA, the Secretary may exclude that provider from the federal healthcare programs for a discretionary period, and impose administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

## FACTUAL BACKGROUND ON THE FEDERALLY
## FUNDED HEALTH INSURANCE PROGRAMS

### The Medicare Program

### 31 U.S.C. § 3729

40.     In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Payments from the Medicare Program come from a trust fund (Medicare Trust Fund) that is funded through payroll deductions taken from the work force, in addition to government contributions.

41.     The Medicare Program is administered through the United States Department of Health and Human Services (AHHS®) and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

42.     Much of the daily administration and operation of the Medicare Program is managed through contractors, typically private insurance companies, that contract with the CMS.  These private insurance companies are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

43.     Over the last thirty (30) years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

44.     Critical to the continued success of the Medicare Program are the fundamental concepts that medical providers only bill the Medicare Trust Fund for medical treatments or services that are legitimately ordered by a physician and, therefore, medically necessary.  For Medicare to succeed, medical providers cannot be allowed to take advantage of their elderly and disabled patients.

QUI TAM COMPLAINT - 10

45. Physicians and other health care providers, when submitting a claim for payment for medical treatment or services provided to a Medicare recipient, must certify that the treatment or service was Areasonable and necessary for the diagnosis or treatment of illness or injury.@ Soc. Sec. Act ' 1862(a)(1)(A).

46. The fundamental concept that only treatments or services that are medically necessary be billed is essential to the continued viability of the Medicare Program and the future viability and solvency of the Medicare Trust Fund.

## OTHER FEDERALLY FUNDED
## HEALTH INSURANCE PROGRAMS

47. Medicaid is a joint federal/state program that provides care for indigent and disabled people. Although the Medicaid program is administered by the states, it is funded in a significant part by the federal government. The actions of defendants set forth herein caused significant damage to federal and state Medicaid programs within each state where defendants transact business.

48. The Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS") is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

49. The Civilian Health and Medical Program of the Veterans Administration ("CHAMPVA") provides similar benefits for spouses and children of veterans who are entitled to VA permanent and total disability benefits and to widows and children of veterans

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

who died of service-related disabilities. The program is administered by the Department of Defense and funded by the federal government.

## CDI BACKGROUND FACTS

50.    CDI currently operates imaging centers in multiple locations throughout the United States. CDI's imaging centers are linked by the most advanced teleradiology networks in the nation. CDI uses state-of-the-art imaging equipment to perform radiology exams. The exams are read or interpreted by sub-specialized radiologists. The CDI radiologists provide interpretative services to clinics, hospitals, and out-patient imaging centers across the United States.

51.    CDI operates diagnostic imaging centers at the following locations across the United States: Ocoee, Florida; Oviedo, Florida; Winter Park, Florida; Bourbannais, Illinois; Geneva, Illinois; Fishers, Indiana; Indianapolis East, Indiana; Indianapolis North, Indiana; Indianapolis South, Indiana; Westwood, Kansas; Burnsville, Minnesota; Coon Rapids, Minnesota; Duluth, Minnesota; Eden Prairie, Minnesota; Maplewood, Minnesota; Mendota Heights, Minnesota; Owatonna, Minnesota; St. Cloud, Minnesota; St. Louis Park, Minnesota; Waite Park, Minnesota; Woodbury, Minnesota; Chesterfield, Missouri; Frontenac, Missouri; O'Fallon, Missouri; Federal Way, Washington; Lakewood, Washington; Mountlake Terrace, Washington; Delafield, Wisconsin; Mequon, Wisconsin; and Wauwatosa, Wisconsin.

52.    The radiological exams performed by CDI are designed to image or see inside a specific area of the patient's body for purposes of making a diagnosis. The therapeutic procedures performed by CDI are designed to inject therapeutic agents to the patients using radiology diagnostics for guidance. These procedures are commonly known as "pain management procedures."

QUI TAM COMPLAINT - 12

53.     Radiologists, such as Relator Serra, are medical doctors who are specially trained to interpret imaging exams or procedures that are used to diagnose and/or treat a patient's medical condition. Although radiologists are rarely seen by the patient, they play an important role in the overall diagnostic assessment of the patient's condition. The radiologist supplies a treating or referring physician with the information they need to provide the appropriate treatment or care to the patient based on the results of the imaging or radiology exam.

54.     CDI has developed a basic business model for expansion. The company identifies a radiologist in a geographic market that they are interested in for the purpose of opening a new diagnostic center. The radiologist that was targeted by CDI usually joined Dr. Heithoff's professional association, MSCPA.

55.     Most of the 32 CDI facilities involve a corporate LLC structure whereby the doctors buy a minority percentage of ownership. The average CDI facility has 20% physician ownership or less. The exception is in the State of Washington where the physicians own 49% of the LLCs.

56.     In all CDI locations, with the exception of the Washington, Wisconsin, and Duluth, Minnesota facilities, the physicians belong to MSCPA. In those three areas, the physicians formed their own independent professional associations.

57.     By way of example, consider the typical CDI facility located at Federal Way, Washington (CDI Northwest, LLC). Dr. Serra performs MRI, CT and diagnostic and therapeutic injection procedures. Dr. Serra owns 49% of CDI, Northwest, LLC and CDI owns the remaining 51%. CDI, Northwest, LLC operates and manages the CDI facility at Federal Way, Washington.

QUI TAM COMPLAINT - 13

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

58.     CDI, by assignment, handles most of the professional (MR and CT) and all of the technical billing generated.  The fees for injection procedures ("needles") are not billed through CDI.  The injections do not normally have a technical component.  The injections involve only the professional fee for the doctor who provides the injection.  The professional association that the physician is affiliated with (e.g. MSCPA) bills for the professional component of the injection procedures or "needles."  As an additional aspect of the lease agreement, the LLC pays between 6% and 8% to CDI for management fees, and 5% to CDI for billing fees.

59.     At this point in time, the 32 facilities operated by CDI are known as independent diagnostic testing facilities ("IDTFs").  CMS has defined these IDTF facilities as being entities independent of a hospital or a physician's office in which diagnostic tests are performed by licensed or certified non-physician personnel under appropriate physician supervision.  In the case of CDI, the radiologists who actually read the imaging examinations reassign their billing to CDI.  CDI then submits global bills to the private payors and federal programs referenced above for all professional fees (with the exception of fees related to "therapeutic needles") and technical fees related to the diagnostic imaging tests furnished to beneficiaries of federal programs.

60.     Accordingly, in most cases, CDI bills for both the professional component of the service through a reassignment of benefits and for the technical component of the radiology exams provided to CDI patients.

QUI TAM COMPLAINT - 14

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

## CDI HAS DEFRAUDED FEDERALLY-FUNDED

## HEALTH INSURANCE PROGRAMS

61.     CDI has defrauded federally-funded health insurance programs by presenting false claims for payment and inducing illegal patient referrals to CDI facilities across the United States.

62.     CDI has engaged in a number of illegal actions which have resulted in the submission of false claims.  Simultaneously, CDI has sought and received illegal patient referrals.  In addition to the above, CDI has engaged in a number of billing schemes and pricing practices which are prohibited by federal and state law which resulted in illegal claims being presented for payment to federal programs.  Examples of these illegal actions include but are not limited to the following schemes:

I.     **CDI HAS CONTINUALLY, INTENTIONALLY AND SYSTEMATICALLY BILLED FEDERALLY-FUNDED HEALTH INSURANCE PROGRAMS ("FEDERAL PROGRAMS") FOR RADIOLOGICAL EXAMS DESPITE THE ABSENCE OF A PHYSICIAN'S ORDER AS REQUIRED BY LAW**

63.     The law applicable to IDTFs, such as the facilities operated by CDI, is very clear.  All procedures performed must be specifically ordered _in writing_ by the physician who is treating the beneficiary.  The written order must specify the diagnosis or other basis for the testing.  CDI cannot bill federal programs for _any procedure_ based on internal protocols without a _written order_ from the treating physician.

42 CFR § 410.33(d) states, in pertinent part:

"All procedures performed by the IDTF must be specifically ordered in writing by the physician who is treating the beneficiary, that is, the physician who is furnishing a consultation or treating a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. . . .   The order must specify the diagnosis or other basis for the testing.  The supervising physician for the IDTF may not order tests to be performed by the IDTF, unless the IDTF supervising physician is in fact the beneficiary's treating physician.

QUI TAM COMPLAINT - 15

That is, the physician in question had a relationship with the beneficiary prior to the performance of the testing and is treating the beneficiary for a specific medical problem. The IDTF may not add any procedure based on internal protocols without a written order from the treating physician."

42 CFR § 410.33(d).

64.    Failure to obtain a written physician's order is a blatant violation of Medicare's medical necessity requirement. Conducting a test based on internal protocols without a written order is also a violation of medical necessity. Defendants routinely violated the law without regard for either prohibition.

65.    The most fundamental requirement that must be present as a prerequisite to establishing medical necessity is the existence of a physician's order. Without a physician's order that requests a specific radiology exam, no exam can be conducted or billed to any federal program.

66.    Despite the clear language and simplicity inherent in this CMS regulation, defendants submit tens of thousands of claims annually for payment to the government without physician orders. No medical necessity existed for those radiology examinations. The submission of claims or billing for services where no medical necessity exists is a blatant violation of the FCA.

67.    For illustrative purposes, it is helpful to look at the specific violations occurring on an on-going basis at CDI's Mountlake Terrace, Washington location. Relator West and Relator Serra have specific knowledge as to the violations occurring at the Mountlake Terrace (hereinafter "MLT") facility. The MLT facility is located at 6808 222nd Street, Suite 100 Northstar Place Building, Mountlake Terrace, Washington.

68.    Relator West, as a part of her job responsibilities for CDI, has direct access to test data, billing information and patient medical records.

QUI TAM COMPLAINT - 16

69.     Relator West is the Vice-President of Business Development and Operations for CDI in the State of Washington. Her job responsibilities include the management of operations, marketing and business development for CDI's Washington diagnostic centers.

70.     Shortly after her hire by CDI in May 2004, Relator West became aware that there was a high number of patients who were receiving radiologic services at MLT although no written physician orders requesting the services were ever obtained. In fact, Relator West personally conducted an audit and discovered that over 95% of the federal beneficiary patient files she audited at MLT did not contain orders from the referring physician as is required by CMS and 42 § CFR 410.33(d).

71.     Shortly after making this alarming discovery, Relator West discussed the subject with Natalie Culhane. Ms. Culhane had worked for CDI and overseen the billing for the MLT facility for the last ten years where she had acted as Business Office Manager.

72.     Ms. Culhane indicated to Relator West that the deficiency in regard to the failure to obtain physician orders prior to providing and billing radiological tests was a long-standing and well-known deficiency within the CDI system. Ms. Culhane's statement was confirmed by Sue Holman. Ms. Holman also was a Business Office Manager at CDI. She told Relator West that "more than half of the time they don't even know who wants the tests or why they are doing the tests."

73.     In arriving at the federal beneficiary error rate at Mountlake Terrace which exceeded 95%, Relator West utilized an objective sampling methodology. She conducted a retrospective electronic chart review with the intent of identifying the number of referring physician orders present and retained within the patient file as required by CMS.

QUI TAM COMPLAINT - 17

74.     Initially, Relator West examined 20 paper charts to make sure that any and all paper orders, tests, insurance and other clinically relevant information was in fact scanned into the CDI electronic medical record (hereinafter "EMR"). CDI implemented the scanning of medical records utilizing EMR in 2002.

75.     In each one of the 20 paper charts examined, Relator West found that the documentation existing within the 20 files of all clinically relevant information had in fact been scanned into the EMR. Having established the fact that the paper charts were indeed scanned into EMR, she set out to conduct a random sampling of CDI patient files. 42 CFR § 410.32(d)(2)(ii)(A) and (B) require CDI to document and maintain physician orders for each test performed.

76.     Relator West randomly chose two or three days from 2000, 2001, 2002, 2003 and 2004. She chose her family's birthdates and surrounding dates to use as the subject dates for the random study. She used 13 dates. 765 tests were evaluated on those 13 dates.

77.     Relator West was able to successfully complete her audit because of the information contained within each EMR. Each EMR included the patient's medical record number ("MRN"), patient name, date of service ("DOS"), study/tests performed, previous studies, orders (yes or no), insurance type and billing information (yes or no).

78.     The overall findings from the audit conducted by Relator West were as follows:

*Total Tests – 765 (263 federal, 502 private pay)*

*Federally Regulated Program Statistics:*

| | |
|---|---|
| *Total Tests* | *263* |
| *Percentage of total* | *34%* |
| *Tests with no orders* | *248* |
| *Tests with poorly documented verbal orders* | *12* |

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

| | |
|---|---|
| *Tests with well-documented verbal orders* | *0* |
| *Tests with written orders* | *3* |
| *Number of tests billed* | *261* |
| *Error Rate for Federal Payors* | *95%* |

79.     In summary, of the 263 tests provided to federally-funded insurance program beneficiaries, 248 of these tests did not have any physician orders.  This constitutes a 95% error rate.  248 tests were improperly performed and billed and each claim submitted in furtherance of those tests by defendants constituted a violation of the FCA.  No medical necessity existed for any of the 248 tests billed to federal programs where no physician order was present.

80.     The high error rate discovered by Relator West was confirmed to be consistent with the error rates previously documented in historical internal audits done in prior years by other CDI employees.  Natalie Culhane told her that over the last four years that she too had performed random audits at MLT.  Ms. Culhane said "less than 20% of the tests had physician orders."

81.     On October 1, 2004, Relator specifically complained about the absence of written orders in an e-mail to her manager, Ron Charpentier.  Mr. Charpentier was Chief Operating Officer of CDI at that time.  She also notified Len Richter, who was the V.P. of the CDI Business Officer at corporate headquarters.  She informed him specifically about the non-compliance of MLT regarding the absence of orders described above.

82.     Relator West also corresponded with Don Jacobson about the "no orders" issue.  Mr. Jacobson is the Chief Administrative Officer and the putative CDI Corporate Compliance Officer.  CDI had actual knowledge at executive levels of these deficiencies by and through repeated disclosures from Relator West to CDI officers.

QUI TAM COMPLAINT - 19

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

83.     Relator West also repeatedly made the results of her audit known to MLT officers and employees.

84.     Despite her specific audit findings and protestations to CDI about the medical necessity deficiencies regarding "no physician orders," this problem was not resolved. To the contrary, the deficiencies continue to the present time.

85.     In her continuing quest to determine CDI's level of compliance or lack thereof, Relator West separately audited a day in the month of August 2004. The results of her one-day audit are as follows:

*Total Tests*   46

28% of tests did not have orders

*Sub-Category*

| | |
|---|---|
| *Federally Regulated Programs with order requirements* | *12* |
| *Tests with no orders for federal beneficiaries* | *7* |
| *Error Rate for "no orders for federal beneficiaries"* | *58%* |

86.     Accordingly, in written and verbal forms, Relator West again documented these specific medical necessity problems. She advised CDI that MLT should not perform tests on any patients who have federally-regulated insurance without a completed written order in hand when the patients presented for their test or procedure.

87.     The key point emphasized by Relator West was that CDI should get the written physician order before the patient was tested. There were isolated occasions wherein Relator West learned that CDI sought to obtain physician orders after the tests had been performed and after a bill had already been submitted to the federal health care program. She discouraged this prohibited, improper practice of back-filling orders.

QUI TAM COMPLAINT - 20

88.     The audit information contained above was transmitted by Relator West to CDI officers verbally, in memos and e-mails. Her findings were also discussed and documented within the Board minutes of a recent November 16, 2004 meeting of the Management Committee of CDI Seattle, LLC.

89.     Relator West has frequently complained about the absence of written physician orders to Don Jacobson. Despite the fact that Mr. Jacobson is CDI's compliance officer, he refused to support Relator West in her position that CDI should have a "zero tolerance" with regard to billing for tests where no written physician order was present.

90.     When Relator requested "zero tolerance" at a meeting that occurred at MLT on July 12, 2004, she was rebuked. One of the MLT radiologists, Dr. McCorkell, replied to Relator West that "zero tolerance usually means zero intelligence." Mr. Jacobson and Mr. Charpentier were participating in that meeting by phone but the said nothing to protest or object to Dr. McCorkell's statement. McCorkell is a minority owner of defendant CDI – Seattle, LLC.

91.     At a Board of Directors meeting held on August 10, 2004, Relator West again informed the attendees that a policy of "zero tolerance" should be implemented. After the meeting, she was informed by her manager that she should "keep the peace" with the physicians because "CDI did not want any problems with the physicians while they were trying to sell the company." CDI was motivated to keep the revenues up as high as possible in light of the pending $250,000-plus million dollar sale of CDI to Onex.

92.     In the past, CDI has done a number of random samplings involving CDI facilities located across the country to determine compliance with the written physician order

QUI TAM COMPLAINT - 21

requirement. As recently as August 17, 2004, Relator West received an e-mail regarding compliance problems from Len Richter who is Vice-President of CDI's Business Office.

93.    Mr. Richter indicated that he had conducted a random audit of Medicare procedures done at CDI facilities to determine if orders were being obtained and scanned into the EMR. In his sampling, Mr. Richter found that 33 percent of the Medicare procedures performed and billed for did not have written orders at CDI facilities located in Indianapolis, Indiana and Delafield, Wisconsin. Based upon other audits that she conducted herself, Relator West believes that Richter intentionally understated these error rates.

94.    For example, an audit was just conducted by Relator West for CDI patients treated at the CDI – Waite Park facility in Waite Park, Minnesota. Of the 15 patients treated, 40% of them were federal or state-funded insurance patients. 50% of the federal or state beneficiaries did not have written physician orders. Accordingly, a 50% error rate was discovered.

95.    Similar error rates were recently found in an audit of the April 15, 2004 patients visiting the CDI – St. Cloud facility in St. Cloud, Minnesota. On that date, 16 patients with federal or state-funded insurance were treated. No physician orders were present in eight of those patient files. Accordingly, a 50% error rate was documented.

96.    In November 2004, Relator West also conducted an audit for the patients previously seen on December 8, 2003 at the Coon Rapids and Woodbury CDI facilities in Minnesota. On December 8, 2003, none of the patients who received federal or state-funded insurance had written orders for the diagnostic orders studies performed on said date. Accordingly, a 100% error rate was discovered.

QUI TAM COMPLAINT - 22

97.     On or about December 23, 2004, Relator West conducted a three-day audit of the CDI facility at St. Louis Park, Minnesota.   Relator randomly chose her birthday, August 23rd, and the two days following to conduct the audit.   She discovered that 68 studies were performed in the St. Louis Park facility wherein federally-funded programs were billed. For 41 of those studies, no written orders existed.   Accordingly, a 60.5% error rate was discovered.

98.     Relator West and Relator Serra have personally audited and reviewed business records to determine whether written orders are required as a prerequisite to testing at the CDI facilities within and outside the State of Washington.   All of the information that they have reviewed supports their own investigative findings and assertion that the medical necessity violations cited herein is a problem that is spread throughout CDI facilities across the country. The only CDI facilities that appear to consistently require written orders prior to billing federal program beneficiaries are located in Florida.

II.     **CDI HAS OFFERED, SOLICITED AND CONDONED ILLEGAL PATIENT REFERRALS IN VIOLATION OF THE FEDERAL ANTI-KICKBACK ACT (AKA)**

99.     CDI regularly solicits illegal patient referrals in violation of the AKA.   As a result of the business generated from the illegal referrals, CDI receives revenues that they are not entitled to receive and would not receive, but for improper inducements.

100.    By way of example, Relator West has discovered that CDI has targeted a major referral source in the Seattle, Washington area and offered illegal inducements specifically for the purpose inducing patient referrals.

101.    On September 22, 2004, CDI Director of Operations, Robert Usher, told Relator West that CDI had made a "financial deal to get and keep business" with a medical

QUI TAM COMPLAINT - 23

practice ("Sound Urological") in order to obtain referrals for diagnostic procedures from said medical practice.

102.    The standard radiological practice for performing a CT KUB involves a CT scan of the kidney, ureter, and bladder without contrast, billing CPT codes 74150, 72192 and a single film x-ray.

103.    However, in order to encourage patient referrals from Sound Urological, CDI discounted its charges for CPT codes 74150 from $580, which is CDI's charge, to $350. CPT code 72192 was discounted from $508, which is CDI's charge, to $300.00. Medicare's fee schedule for Washington State allows $310.33 for CPT code 72192.

104.    There are further discounts designed for Sound Urological for CT IVPs. A CT IVP is an intravenous pylogram test that uses x-rays to look at the structure and function of the urinary system. CPT codes 74170 and 72194 are billed when performing and interpreting this test. CDI's charge for 74170 is $715, and MLT discounts the charge to $525. CDI's charge for CPT code 72194 is $697, while MLT discounts this charge to $375. Medicare's allowable reimbursement for CPT code 72194 is $426.83. Additionally, the MLT facility and CDI physicians perform two x-rays on the patients as an "added service" to the referring physicians – and give these x-rays away. This has a value of $180 per patient. CDI markets these practices to Sound Urological and describes these discounts as being "the best deal in town."

105.    Consequently, Sound Urological has made referrals of private patients and beneficiaries of federal programs such as Medicare and Medicaid to CDI. These free tests and discounted charges were not offered to other CDI referral sources.

106.    This type of conduct is expressly prohibited. Similar schemes involving the providing of clinical tests for discounted prices or free-of-charge have been targeted by

QUI TAM COMPLAINT - 24

government prosecutors for the last ten years.  OIG Special Fraud Alerts have been issued to discourage this blatant type of illegal inducement.

107.    Since it is the physician, and not the patient, who generally selects the clinical or diagnostic laboratory, it is essential that the physician's decision regarding where to refer patients is based only on the best interests of the patient.

108.    CDI offered discounted prices and free tests to Sound Urological to induce referrals.  The prices charged to Sound Urological did not reflect fair market value or an arm's length transaction.  As described hereafter, the rates charged to Sound Urological were well below the rates charged to federal programs.  This type of price discrimination is illegal and violative of the federal AKA.

III.    **AT THE MLT FACILITY OPERATED BY DEFENDANT CDI – SEATTLE, LLC, CDI IS PERFORMING MRA TESTS ON PATIENTS AS A MATTER OF COURSE IN EVERY INSTANCE WHEN AN MRI IS ORDERED ALTHOUGH THE REFERRING PHYSICIAN HAS NOT REQUESTED THE MRA OR PROVIDED A PHYSICIAN ORDER FOR AN MRA**

109.    As stated before, Medicare prohibits radiologists from performing a diagnostic procedure that was not ordered by the treating physician.  All tests must be accompanied by a written order from the referring physician.  42 CFR § 410.33(d).

110.    Despite this fact, at the MLT facility, CDI routinely and unilaterally provides an MRA exam in every instance where an MRI exam is performed.

111.    An MRI is a very specific test that provides a view of a specific organ.  An MRI has its own procedural code.  Conversely, an MRA is a view of the blood vessels surrounding the organ. The MRA is a different procedure that is separate from an MRI.

QUI TAM COMPLAINT - 25

112.    Relator West avers, upon information and belief, that in most cases, CDI is not billing for the "added on" MRA test. However, this does not invalidate the applicability of the Medicare regulations regarding medical necessity and the requirement that each and every examination be appropriately ordered by a physician.

113.    The Department of Health and Human Services ("HHS") and Centers for Medicare and Medicaid Services ("CMS") have clear rules that require IDTFs to obtain orders from referring physician. A written order must be obtained from the referring physician for every test and procedure performed by CDI. This order must indicate the reason (diagnosis) for performing the procedure or test. The order cannot be changed or augmented without an addendum to the order, or a new order from the managing (referring) physician.

114.    Despite these clear rules and Relator West's warnings about the illegality of this practice, CDI continues to perform MRAs routinely on a daily basis without physician orders.

115.    This abuse regarding MRA(s) with no medical necessity has been a topic of dissention between Relator West and CDI high-level employees, such as Mr. Richter, who is a CDI Vice President. Relator West has also discussed this illegal practice with CDI's Corporate Chief Administrative Officer and Compliance Officer (Don Jacobsen) and CDI's Chief Operating Officer (Ron Charpentier).

116.    If the referring physician knows he or she will get a "free MRA" with every MRI ordered, two specific illegal inducements occur. An over utilization of MRI tests can occur. If the MRA is free only when it is given in conjunction with an ordered MRI, it is likely the doctors may order more MRIs than are medically necessary. Also, since the free MRA tests results are given to the referring doctor who is treating the patient, the doctor is

QUI TAM COMPLAINT - 26

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

1  receiving free services and indirect remuneration in exchange for sending his MRIs and other

2  diagnostic imaging tests to CDI.

3      117.   As a consequence of CDI's actions, the United States of America has been, and

4  continues to be, severely damaged.

## IV. DEFENDANTS SYSTEMATICALLY AND ROUTINELY OVERBILL MEDICARE AND MEDICAID BY CHARGING FEDERAL PROGRAMS AMOUNTS SUBSTANTIALLY IN EXCESS OF REASONABLE AND CUSTOMARY CHARGES AND COSTS

    118.   CDI systematically and regularly submits bills to federal programs containing

charges which are substantially in excess of CDI's customary charges.  This type of price

discrimination is illegal.

    119.   By way of example, Realtor West has discovered an audit that was performed

by Natalie Culhane in June 2004.

    120.   Ms. Culhane shared a summary of her findings with Relator West with regard

to 518 MRAs that were performed in 2003 and 2004 at the MLT facility.  The audit reflected

that 60% of the MRAs were done at no charge.  The educated presumption is that most, if not

all, of that 60% of MRAs were provided to patients free of charge in connection with an MRI

test that was ordered by a referring physician.

    121.   However, Ms. Culhane also discovered that out of the 518 patients surveyed

that 35% of the MRAs were performed and billed at a reduced rate of $350 per MRA.  This is

particularly significant because the Medicare fee schedule rate was $479 for MRAs at that

time.  Accordingly, CDI was discounting significantly the Medicare fee schedule rate by $129

per procedure.

    122.   Relator West obtained more information about illegal inducements and

discounts provided to referral sources by CDI's facility at MLT. Relator West discovered that

QUI TAM COMPLAINT - 27

MLT reduces its price for CT Orbits to its referring physicians so that they can offer a "value service" to the referral sources.

123.    During a "kick off" meeting on June 23, 2004 for the new radiology information system, Dr. Schwartz advised the entire staff that "he performs 'no charge' MRAs on MRI patients as an 'added service' for his referring physicians, to get more business." Natalie Culhane was witness to this statement and Relator West and Ms. Culhane had a discussion about the inappropriateness of his comment the following week.

124.    A CT Orbit test is a CT test of the orbits (eyes).  This procedure is routinely performed in order to "screen" the patient for metal before they get an MRI test.

125.    The CPT code for a CT Orbit is 70480.  CDI's customary charge for that procedure is $576.

126.    The Washington Medicare maximum allowable charge for CPT code 70480, as per the 2004 fee schedule, is $153.25 per charge.

127.    Despite the 2004 fee schedule amount referenced in the preceding paragraph, MLT reduced its charge to the referring physicians to $125 per CT Orbit for non-Medicare/Medicaid beneficiaries.  Again, CDI specifically set out to undercut the Medicare allowable charge and did so by approximately $28.25 per procedure.

V.    **CDI HAS ENTERED INTO ILLEGAL LEASE ARRANGEMENTS AND JOINT VENTURE ARRANGEMENTS ACROSS THE COUNTRY WITH PHYSICIAN GROUPS WHICH RESULT IN ILLEGAL REFERRALS AND REMUNERATION**

128.    As another example of illegal inducements and improper arrangements, CDI has entered into approximately 30 "lease" arrangements across the country.  In the most common standard lease arrangement, a separate physician group ("lessee") leases the technical services (or the technical and professional services) provided by CDI ("lessor") and/or its

QUI TAM COMPLAINT - 28

radiologists. Under this arrangement, the ICD services are provided to patient within a CDI facility.

129.    In many of the leases involving a CDI lease of equipment and/or professional services, Medicare beneficiaries are excluded. However, as a part of the lease arrangement, the lessee is given a discounted rate for the services provided. The lessee performs the billing for the equipment use or services provided to the patients. The rate for the equipment used or service provided to the lessee is lower than the rate charged to the federal program beneficiaries.

130.    As an additional aspect of the lease arrangement, the lessee refers its Medicare/Medicaid patients to CDI outside of the lease. For these patients, the lessee does not handle the billing. When CDI receives these federal beneficiary referrals, the federal programs are billed by CDI at rates <u>higher</u> than rates charged to lessees and non-federal beneficiaries referenced above.

131.    This practice constitutes an illegal form of remuneration and is violative of the AKA, illegal referral and "customary charge" or "customary costs" laws applicable to this factual scenario. CDI is making up the revenues lost on non-federal beneficiaries by overcharging the federal beneficiaries referred to CDI by the lessees. This type of discounting that discriminates against federal programs is also violative of the AKA prohibitions.

132.    There is also another type of lease arrangement that is equally improper. In addition to the 30 leases referenced above, there are 20 other leases wherein the diagnostic services are actually provided to patients <u>inside</u> a physician group's offices. This type of lease is camouflaged as a form of in-office ancillary service.

QUI TAM COMPLAINT - 29

133.   In the latter arrangement, CDI and the referring physician group take advantage of the physician group's captive referral base.

134.   In this arrangement, the physician group takes little or no bona fide business risk.   CDI acts as a manager/supplier and provides the full scope of diagnostic services rendered to the patients within the physician groups' offices.

135.   The practical fact that the arrangement, in its entirety, is that the physician group is provided the opportunity to bill insurers and patients for business otherwise provided by CDI.   The remuneration from this venture to the physician group (i.e., the profits of the venture) takes into account the value and volume of the business the physician group generates.

136.   Even if federal program beneficiaries are excluded from this type of lease arrangement, the problems emanating from the relationship remain because of the referrals and kick-backs made by the lessees to CDI as the quid pro quo for the lease arrangement.

137.   Specifically, even if the federal beneficiaries are not treated within the physician groups' offices, they are referred directly to the CDI diagnostic facility outside the physicians' offices.   The physician groups are benefiting from the profits resulting from the joint venture within their own offices.   CDI is benefiting from the referrals made to CDI by the physician groups.

138.   The problem at the heart of both schemes is the same.   Referring physicians receive remuneration and profit, and CDI directly profits from improper referrals made by the physician groups.

QUI TAM COMPLAINT - 30

## VI.   DEFENDANTS REGULARLY AND SYSTEMATICALLY VIOLATE FEDERAL LAW WITH REGARD TO FEE-SPLITTING, HIPPA REGULATIONS AND ILLEGAL PHYSICIAN FEE BILLINGS

139.   In addition to all of the other FCA and AKA violations referenced above, defendants violated multiple federal statutes and laws.   Examples of defendants' illegal conduct not previously referenced include the following:

(a)   CDI regularly engages in the corporate practice of medicine which is expressly prohibited by law.   An overt example involves CDI's practice of "fee-splitting."   In the fee-splitting scheme, CDI bills and collects on behalf of the CDI franchise (such as CDI – Seattle, LLC) for professional and technical services performed at its centers.   The collections are split by modality (example, 70% for MR, 20% for CD, and 33% for deep tissue injections).   Under Washington state law, this is expressly illegal.   Pursuant to 42 CFR, § 410.33(f), "an IDTF must comply with the applicable laws of any state in which it operates."   Accordingly, CDI has violated federal law for every bill submitted on behalf of any federal program beneficiary with regard to the CDI facilities in Washington;

(b)   CDI's confidentiality practices violate HIPPA laws.   At the MLT facility, several thousand patient reports sit on an unprotected corporate S-drive.   All that is needed to access these reports is a connection to the network from any computer that (i) is on the CDI network, such as any desktop in a CDI office, or (ii) from any computer that has been fitted with a VPN (virtual private network) software, which includes the laptops of hundreds of CDI employees – many of whom are non-clinical.   These employees can sign onto the network and obtain protected patient information through the internet connection at a public library, airport, etc.   The majority of CDI employees are provided with a password that can afford them access to full patient data even though they are in a remote market; and

QUI TAM COMPLAINT - 31

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

(c)     Medicare billing violations regarding the improper submission by defendants of professional fees are occurring on a daily basis. For example, after Dr. Serra left MSCPA in October 2003, CDI continued billing his professional fees through MSCPA and not through the professional entity which Dr. Serra formed (Sound Medical Imaging). CDI was aware of federal prohibition against billing health care programs for professional services rendered when there is no professional affiliation or service contract existing between the provider (Dr. Serra) and the billing entity (MSCPA).

140.    As shown above, the defendants routinely operate their facilities and bill federal programs in a reckless and illegal fashion. Each of the violations referenced above has been brought to the attention of CDI at the executive level, but CDI has refused to cure the deficiencies.

141.    Relators have it, on information and belief, that defendants have not disclosed the existence of any of the deficiencies referenced herein despite their express knowledge of the illegality of each of the practices described herein.

142.    As a result of all of the aforementioned illegal practices, the federal programs have been damaged severely and continue to be damaged on a daily basis.

## COUNT I

### Violation of False Claims Act

### 31 U.S.C. §§ 3729-3733

143.    Paragraphs 1 through 142 are incorporated into Count I as if fully set forth herein.

144.    This is a civil action brought by Relators West and Serra on behalf of the United States and against defendants under the Federal False Claims Act, 31 U.S.C. § 3729(a) (1) and (2) and 31 U.S.C. § 3730(b).

QUI TAM COMPLAINT - 32

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

145.   Defendants knowingly, or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, and is still presenting, or causing to be presented false or fraudulent claims for payment by the federally funded health insurance programs, in violation of, inter alia, 31 U.S.C. § 3729(a)(1).

146.   Defendants' actions, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, made used, caused to be made, or caused to be used, false or fraudulent records and statements to get false or fraudulent claims paid or approved, in violation of, inter alia, 31 U.S.C. § 3729 (a)(2).

147.   The United States of America, unaware of the falsity of the claims and/or statements made or caused to be made by defendants, and in reliance on the accuracy of these claims and/or statements, paid and may continue to pay for diagnostic services provided to individuals insured by the federally funded health insurance programs, including Medicare.

148.   As a result of said illegal actions by defendants, the United States of America has been, and will continue to be, severely damaged.

## COUNT II

### Conspiracy

### 31 U.S.C. § 3729(a) (3)

149.   Paragraphs 1 through 148 are incorporated into Count II as if fully set forth herein.

150.   In addition to the other claims set forth herein, defendants and their affiliated entities have conspired together in an illegal fashion in violation of 31 U.S.C. § 3729(a)(3).

151.   The defendants conspired with each other to get false and fraudulent claims allowed and paid by the United States.

QUI TAM COMPLAINT - 33

152.    The defendants acted together and in concert to effectuate the object of the conspiracy.  Defendants, in reckless disregard or deliberate ignorance of the truth or false information involved, made, used, caused to be made, or caused to be used false or fraudulent records and statements to get false or fraudulent claims paid or approved to obtain payments from federally funded health insurance programs that were not otherwise appropriate or legal. As a result of defendants' actions, the United States has been, and will continue to be, severally damaged.

## COUNT III

### Violation Of Federal Anti-Kickback Act

153.    Paragraphs 1 through 152 are incorporated into Count III if fully set forth herein.

154.    In addition to the other claims set forth herein, defendants violated the Federal Anti-Kickback Statute ("AKA").

155.    The AKA makes it a crime to knowingly and willfully offer, pay, solicit or receive any remuneration to induce a person to refer patients or lease services regarding patients who are beneficiaries of a federal healthcare program.  42 USC § 1320a-7b(b)(1)(2).

156.    The term "any remuneration" encompasses several different types of kickbacks, bribes and rebates.  The term "any remuneration" also encompasses economic arrangements, such as the discounts and free ancillary services provided by defendants herein. The AKA has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain money for the referral of services or to induce further referrals.

157.    The CDI leases which are in place across the country are diagnostic services joint venture arrangements which violate the AKA.  OIG advisory opinions have been issued with

QUI TAM COMPLAINT - 34

regard to similar arrangements where it has been concluded that similar arrangements would constitute grounds for the imposition of sanctions and penalties.

158.    The CDI leases and the joint venture arrangements generate prohibited remuneration under the AKA.

159.    The CDI leases are established to permit CDI and the lessees to do indirectly what they cannot do directly; that is, pay the lessee a share of the profits from the laboratory referrals made by the lessee to CDI. By agreeing to provide services that CDI could otherwise provide in its own right for less than the available reimbursement, CDI is providing a referral source – the lessee physician groups – with the opportunity to generate a fee and a profit. Because the intent of the joint venture arrangement is to give the lessee physician groups remuneration through the CDI labs in exchange for referrals to the CDI labs, the AKA statute is violated. These joint venture arrangements constitute improper contractual joint ventures that are used as vehicles to reward the lessee physician groups for their referrals.

160.    Also, to the extent that the contractual arrangements between CDI and lessee physician groups involved reassignment, it has long been established that "reassignment" may not be used to camouflage inappropriate fee-splitting arrangements or payments for referrals.

161.    The free services and discounted pricing provided to non-federal payors also discriminates against the federal payors, which is expressly prohibited by law. The purpose of the joint venture arrangements is to give the referring lessee physician groups remuneration through the diagnostic laboratories in return for referrals to the CDI laboratories. This is a clear violation of the AKA. This type of illegal joint contractual relationship exists between CDI and approximately 50 lessees located throughout the United States.

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

162.   Defendants' conduct in violating the AKA has been willful and purposeful with the specific intent to disobey the AKA.

163.   CDI has discussed the illegality of these contractual relationships at the highest executive levels of the company. In fact, as recently as December 20, 2004, a company-wide dialogue commenced with regard to the applicability of OIG Advisory Opinion No. 04-17 to the CDI leases at issue. Because this Advisory Opinion is directly relevant to the illegality of the existing leases, communications (written and verbal) were sent to and from Relator West.

164.   In discussing CDI's defensive response to Advisory Opinion No. 04-17, Chief Administrative Officer and Corporate Compliance Officer Jacobson said, "We need to continue to build our case that these arrangements are built on quality care <u>and they aren't just to provide the referring M.D.s a return on their investment.</u>" In acknowledging that one of the reasons for the arrangement and remuneration was physician referrals, Jacobson acknowledged an express violation of the AKA.

165.   Accordingly, defendants are liable for all damages caused by their violations of the AKA, administrative sanctions, penalties of Fifty Thousand and No/100 ($50,000.00) Dollars per kickback violation and all other damages permissible pursuant to 42 USC § 1320a7(b).

WHEREFORE, Relators pray for judgment against defendants as follows:

(a)   Defendants be ordered to cease and desist from submitting and/or causing the submission of any more false claims or otherwise violating 41 U.S.C. § 3729 or 42 USC § 1320a-7(b);

(b)   That judgment be entered for both Relators and against defendants in the amount of each and every false or fraudulent claim multiplied as provided by 31 U.S.C. § 3729(a), plus a

QUI TAM COMPLAINT - 36

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

1  civil penalty of not less than Five Thousand Five Hundred ($5,500.00) Dollars nor more than

2  Eleven Thousand ($11,000.00) Dollars per claim, as provided by 31 U.S.C. § 3729(a), to the

3  extent such multiplied penalties shall fairly compensate the United States of America for losses

4  resulting from the various schemes undertaken by defendants' actions together with penalties for

5  specific claims to be identified at trial after full discovery;

6

7  (c)   that Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. §

8  3730(d);

9  (d)   That judgment be entered for Relators and against defendants in the amount of

10  each and every violation of the AKA as provided by 42 USC § 1320a-7(b) for all amounts

11  authorized by said statute, plus additional sanctions of $50,000.00 per kickback violation;

12  (e)   That judgment be entered for Relators and against defendants for any costs,

13  including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relators

14  in the prosecution of this suit; and

15

16  (f)   That Relators be granted such other and future relief as the Court deems just and

17  proper.

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

QUI TAM COMPLAINT - 37

GENDLER & MANN, LLP
1424 Fourth Ave., Suite 1015
Seattle, WA 98101
(206) 621-8868
(206) 621-0512 Facsimile

Dated this ___13th___ day of January, 2005.

Respectfully submitted,

GENDLER & MANN, LLP

By: _____
David S. Mann, WSBA No. 21068

HARMON, SMITH, BRIDGES & WILBANKS

By: _____
Marlan B. Wilbanks, Georgia Bar No. 758223
1795 Peachtree Road, NE, Suite 350
Atlanta, Georgia 30309-2339
(404) 881-1200

MILLER, ALFANO & RASPANTI, P.C.

By: _____
Marc S. Raspanti, Attorney I.D. No. 41350
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
(215) 972-6400

Attorney for Relators

QUI TAM COMPLAINT - 38